The first case is BASF v. Ingevity South Carolina, 2022-1129. Mr. Mazzino, is it? It is, yes. Thank you. Good morning. May it please the Court. In the time I have today, I'd like to focus on two fundamental legal errors in the Board's decision. First, on indefiniteness. The Board failed to... Do you want to very briefly talk about standing? Sure, Your Honor. On BASF? Yes. So, I think here, Mr. Mugelli's affidavit establishes that BASF has concrete plans to sell a potentially infringing product in the United States, which is all this Court's precedent requires. I think the party's dispute about standing has significantly narrowed from the motion-to-dismiss phase. At this point, I understand that Ingevity's main argument is that we have not sufficiently shown that we will sell the Adaptrap product in the United States. But if you look at paragraphs 29 and 30 of Mr. Mugelli's affidavit, he says that customers have expressed interest in purchasing the product for vehicle platforms in the United States. He says they've gone as far as to request specific pricing information and provide information about potential purchasing volumes. And he also says in paragraph 6 that this is a product that was designed specifically to help car manufacturers meet United States emissions regulations. Is the product available now? Does the affidavit address that? Yes. In fact, I think in paragraph 30, Mr. Mugelli says BASF is presently able to provide the product at the volumes that are requested by customers. Do you want to deal with indefiniteness? Yes, Your Honor. So, I'll start there. So, I said two fundamental legal problems. On indefiniteness, I think the Board's legal error was that it failed to recognize that a discrepancy between two measurement methods makes a claim indefinite if that discrepancy is potentially material to infringement, regardless of whether those skilled in the art might not have considered the discrepancy significant in every experimental context. So, here the evidence is clear. The 553 patent teaches two different methods of measuring incremental absorption capacity, the gravimetric and volumetric methods. And all of the evidence shows that those two methods produce different results. When you say all of the evidence, what about the various peer-reviewed articles that were provided? Those suggest otherwise, right? I mean, what do you mean by all of the evidence? I don't think they do, Your Honor. Actually, I think that those articles confirm that those skilled in the art knew there was a discrepancy between those methods. At most, what they show is that in particular experimental contexts, artisans didn't consider that discrepancy significant for particular purposes. But that doesn't speak to whether the discrepancy is material to infringement. The question under this Court's case law, as the Court put it in doubt, is whether the choice of measurement method could affect whether or not a given product infringes the claims. Here, I don't think that's disputed. Even, for example, the Belmico article that Ingevity cites, those authors did everything humanly possible to try to reduce the disparity between these methods, and they couldn't get it any closer than 3%. And, of course, that was across the entire range. Our evidence showed that in the critical range for the 553 patent, the disparity was even higher, as high as 12 to 14%. Okay, but so maybe 3% isn't significant. I don't understand that there's an argument that 12 to 14% isn't, but the argument is that the Board could probably find that it was, in fact, a 3% disparity and that wasn't significant. But what do you make of the Board's statement on Appendix 31 that we need not address petitioners' allegations just to the measurement differences reported by INRIC? Is that INRIC exhibit, which I think is not in the Joint Appendix, is that the one that deals with the 12 to 14%? It is, Your Honor, and if it's not in the Joint Appendix, Mr. Lyon's declaration describing and analyzing the UNITEC results is in the Joint Appendix. I can get you a cite for that if you need it. But so, yes, at a minimum, as we've argued in the briefs, the Board's failure to address our evidence about the size of the disparity would require a remand. But I'd like to address your first point, which is I don't think the Board could properly find under the correct legal standard that a 3% disparity was not material to infringement. There's no evidence of that. The only evidence is that in a particular context, it might not have been viewed as significant, but that is not addressed to this Court's standard. Even if it is material to infringement, why does that show indefiniteness? Why doesn't it go to the question of infringement? And then a jury could determine, based on the evidence presented before it, whether there was infringement or not. What this Court has said, Your Honor, in cases like Dow and Teva and Honeywell, is that if there are two known methods to measure a particular parameter, and those methods produce different results, such that the choice of measurement method could dictate whether or not a product infringes, that renders the claims indefinite. No, they don't say that. They don't say different results. They say significantly different. Fair enough, Your Honor, but I think in the context where this Court uses that, it uses significantly to mean potentially affecting infringement. That is the line this Court has consistently drawn in Dow, whether it could affect whether or not a given product infringes. In Tecada, whether it could be outcome determinative in the infringement analysis. So I think that's the only barometer for significance this Court has ever articulated. If it's all right, I'd like to move on to obviousness. On obviousness, the Board found teaching away because it read Klontz SAE as suggesting that higher-capacity honeycombs might perform better at low purge than low-capacity honeycombs. I don't recall. Did the Board actually use the words teaching away? I believe it did, Your Honor. Okay. I'll check and confirm that, but that's certainly how I, and I think Ingevity as well, read the decision, and I thought they used those words. But in any event, I think the Board's legal error on obviousness was that it failed to appreciate that under this Court's case law, a reference doesn't teach away from a solution that's known in the art to be suitable just because it suggests that another solution might work even better. So, for example, this Court in Ethicon said that the reference didn't teach away from a particular polymer by suggesting that another polymer was, quote, probably more desirable for the given application. And in GE, this Court reversed the Board with the same error. There, the Board had wrongly found that the prior art taught away from a two-stage turbine design by expressing a general preference for a one-stage design and suggesting that a one-stage design might perform better. And this Court has said in those cases and many others, if a solution is known in the art to be suitable, you don't have teaching away just because a reference suggests another solution might be superior. I think that's exactly what happened here. Well, how does the SAE reference suggest that it's suitable? So SAE, in Figure 6, which is at page 2269 of the appendix, tested the Hiltzik Example 2 honeycomb, which it called the baseline honeycomb, under low purge conditions. And it found that the Hiltzik honeycomb met the low purge performance limitation at 100 bed volumes, which is the level specified in the 553 patent. It also found that when heated, which is not inconsistent with the 553 claims, that honeycomb met the limitation even at 50 bed volumes, which is just half as much purge. Now, the Hiltzik honeycomb was just slightly above the range claimed in the 553. It had a BWC of 4, whereas the claimed range is 3 or below. But given how well that honeycomb was performing at low purge, an artisan certainly would have understood that if you just tweaked it slightly, it would still meet that low purge performance limitation. And the board didn't make any contrary findings on that point. And, of course, Hiltzik taught and claimed the entire range of inside absorbents that are claimed in the 553 patent. There's no dispute that the 553 range is a subset of the Hiltzik range. And as this court said in DuPont, where it also reversed the board on this issue, a disclosed range does just that. It discloses the entire range. So these absorbents were both taught and claimed in Hiltzik, and then Klontz would have communicated to those skilled in the art that they could easily meet the low purge performance limitation. That was further confirmed by Klontz WIPO, the second Klontz reference, at Appendix 2252, which tested much smaller and, therefore, lower capacity honeycombs with just 66 milliliters of volumes, about a third of the size, and found that those honeycombs with heating were crushing the low purge performance limitation, even at just 75 bed volumes of purge, again, below the level required in the 553 patent. Now, of course, we also think that the board misunderstood what Klontz was saying about high capacity versus low capacity. In fact, if you read Klontz, it's talking about the capacity of the entire configuration of honeycombs, which could include multiple honeycombs in sequence, whereas the 553 is specifically talking about the very last absorbent in sequence, the one that's exposed to the atmosphere. So there's no inconsistency between saying that the whole configuration should have higher capacity, but the very last absorbent at the end should have low capacity. But the court doesn't even have to reach that issue about how to read Klontz, because at most, if you read it the way the board read it, it suggests a preference that higher capacity honeycombs might potentially, subject to further research, as the author said, might potentially work better at low purge, but it doesn't refute that those skilled in the art would have understood that even the low capacity honeycombs would be a suitable solution at low purge. Do you agree that this issue that you're raising here is an issue that reviewed for substantial evidence, right? So I don't think so, Your Honor. I don't know. I think that, as I understand this court's case, is teaching ways of factual questions reviewed for substantial evidence, but the board has to apply the right legal standard, the right understanding of what it means to teach a way. And I think this court's case has established that a reference does not teach a way as a matter of law just by suggesting that some other solution might be preferable. I agree with you on that. My problem is where does the board say it teaches a way? Because the board, to me, seems to say that a person born in New York City on the art wouldn't have been motivated to modify the references in a way to reach the claimed invention, giving the teaching in quants SAE. That's different, I think, than the technical teaching a way. So I'm still not seeing where the teaching a way is. That's why I asked you about that a little bit. Sure, Your Honor. I think that's how the parties understood what the board was holding. But if it's, in fact, about motivation rather than teaching a way, I think that just makes it stronger for us because this court has been very clear in cases like DuPont and going all the way back to Peterson that it is presumptively obvious there is presumptively a motivation to explore the claimed range through routine experimentation. Here, Hilsik claimed this entire range of inside absorbers. So there's no additional motivation that's needed for somebody to explore that claimed range. And, in fact, both parties' experts said an engineer working in this field would have all the motivation they need from Hilsik to explore the claimed range. But one of the experts said, but not necessarily in a low-purge environment. That's right, and that's where we get to the issue of quants shows that this was suitable in a low-purge environment. Counsel, do you want to use your final time? You can continue or save it. I'll save it. Thank you, Your Honor. Mr. Bureaucrat. Good morning, and may it please the Court. I'll start with standing because that's where Your Honor started. Your Honor, there does have to be concrete plans, and in this case there are no concrete plans to commit an act in the United States, and that's the point we've tried to emphasize. All of the activity they've alleged is vague. They don't say anything. You agree there are concrete plans outside the United States? Well, in order for there to be an actual concern about infringement, there needs to be something that's going to happen in the United States. You're not answering my question. Oh, I'm sorry. What was your question? My question is you agree there were concrete plans outside the United States. We agree that there are activities that have occurred outside the United States. But they're concrete and would be sufficient for standing if they occurred in the United States. If they occurred in the United States or that they were intended or would happen in the United States. In other words, the answer is yes. Yes. But, again, this Court's emphasis is on likelihood of being sued for infringement in the United States. This is a component of the claims. The claims are system claims that require multiple components. They only make or are going to make a single component. So somebody else would have to put together the actual canister and import it in the United States, which there's no concrete plans that have been alleged. Unlike in GE and these other cases where the Court has said there's plants being made in the United States, this case is much more like the JTEKT case in which the product was developed but was still being worked on. I'd like to turn to indefiniteness. So with respect to indefiniteness, do you agree that a 12% to 14% variability of measurement methods would be a problem? If that were established in the art as being what the two methods would yield, that could be a problem. But in this case, the evidence showed that that was the result of experimental error. That's the evidence that was before the Board. But I have difficulty in seeing the Board as agreeing with that point because on A31 they seem to refuse to address those allegations about the 12% to 14% measurement differences. We need not address petitioners' allegations. But they did need to address them, didn't they? Well, no, Your Honor. We don't think that they actually did. And what they're saying in that passage is when you have peer-reviewed articles and industry standard publications that establish that these two methods of measuring absorption capacity yield comparable results, that any differences that may occur are a question of whether or not there's infringement. And that's why they cited the Presidio case just before the second. You mean they can completely refuse to look at the experimental data because they're peer-reviewed articles that come out, in your view, the other way? They didn't completely refuse to look at it. If you look at appendix page 27, you see that they went through all of the parties' arguments. And they said that they understood that BASF was arguing that there was evidence from a third-party intertech and also other evidence. For sure they understood that the evidence was before them, but they say we don't need to address it. Isn't this just, it does read, it's problematic because it does read as if they're identifying here's the petitioner's evidence, here's the patent owner's evidence. Now had they said we find, you know, we find the evidence of the patent owner more credible. We think that the peer-reviewed articles, which were not litigation-inspired material, is more credible than the test results. But they didn't. They simply said we need not address. Why is that in the APA program? I think that is what your Honor said, is exactly what the board did say. Because on appendix page 30, it says they find that the evidence submitted by patent owner as to the gravimetric and volumetric techniques established as well established in the art as comparable methods. But they don't say anything about the petitioner's contrary evidence. That's true. They find the patent owner's evidence establishes something, but they need to weigh it then under the APA against the other party's evidence. Isn't that what's required? They did weigh it, your Honor. Where did they weigh it? You see just on page 29 of the appendix, they note that one of the peer-reviewed articles, the very bottom, was written by Dr. Zielinski. He's the fellow at Intertec that they asked to do this testing. And Dr. Zielinski is the one who oversaw the testing reported at Intertec 1020. And so they're saying the same gentleman who issued a peer-reviewed article that says these methods should come out the same is the one that did the report, and we weighed that. I believe the way that you read this decision is they weighed all the evidence and believed his peer-reviewed publication over the one report that he did. Plus there's other evidence in the record from Dr. Rockstraw to explain why the Intertec results were the way they were, and which was that the report itself indicated that there were problems with the way in which the samples were prepared. So this is not evidence that... There's no indication that the board agreed with that. That's the problem you have. I mean, the board could have said, there's this evidence that this testing that was done isn't reliable, and we're not going to give it any weight. They could have said that, and we'd probably sustain that. But they didn't say it. They said we don't need to address it. They didn't make a credibility determination based on Mr. Zlinsky or any of that. There's nothing in here. How do we infer that that's what they meant? Well, all you need to do is find that there's a path to their outcome, and the path to their outcome is pretty clear, that they found the peer-reviewed articles and other industry publications, unbiased materials, as Your Honor pointed out, to be more compelling. And as a result... That's the problem. They don't say more compelling. I think on page 30... You would say that we have to infer it and infer that, and we're allowed to do that under our case law that says you can reasonably infer what they thought. The problem is, for me, is that I don't know if they thought that the measurement differences were not credible, or if they just thought that the petitioner's evidence was more credible, or if they really relied on Mr. Zlinsky being on both. Your Honor, I think that this decision, when you read it in its whole and not pick it apart, does explain it understood all of the party's arguments. It then went through and pointed out that it found the peer-reviewed materials and other evidence that we submitted, the patent owners submitted, to be essentially unrebutted, because that was establishing that those afield in the art recognized the equivalence of the two different methods of measurement. And so any evidence to the contrary on an individual test couldn't disprove that point. They say this evidence is essentially unrebutted. That's their way of saying, in our understanding, that any individual test that comes out with discrepancies can't rebut the fact that the industry recognized the equivalence of the two different methods. So that's our way of reading this part of the opinion. And we believe then, under the APA, they have fulfilled their obligation to explain the rationale and consider all the evidence. Again, there's no evidence that they didn't consider it. It's specifically cited in the decision. On obviousness, with respect, there's no indication that the board found a teaching away. What it said was there's no motivation to modify PILSIC to lead to lower adsorbent properties, the lower BWC value and lower gram total. That's Appendix 47. The bottom, they say, we find persuasive Pat Noehner's argument that Klontz SEE teaches contrary to their proposed combination, etc. Not a teaching away, but a teaching that you would do A versus B. Mr. Broecker, Mr. Mazzino earlier said that both parties agree that they viewed the board's opinion as a teaching away, as saying there's a teaching away, the reference teacher's away. Do you agree with that? I don't believe so, Your Honor. I believe we were arguing that there was no motivation. They started with PILSIC as their primary reference. They had to show a motivation to modify PILSIC, which doesn't explicitly have anything to do with low purge. And it also doesn't explicitly disclose the BWC and gram total BWC limitations of the different claims. So they need to have a motivation to make that modification. Again, yes, the BWC in PILSIC is 4. The gram total BWC is 8. These claims are at 3 and 6, respectively. That's not an insubstantial change. That's a 25% difference, and in this field, that can make a huge difference. So we don't agree that we were arguing that there was a teaching away. We were arguing there was no motivation to make a modification, and that the strong teaching in Klontz SAE, that you would not be motivated to decrease the working capacity, was the compelling piece of evidence that the board relied on in making its finding. What about the Rockstraw District Court testimony? Again, they weighed that evidence. If the question here is whether they weighed it, they weighed it in the context in which it was presented. He was giving testimony about the PILSIC patent, which doesn't have anything to do with low purge, and he clarified it in his deposition in this PGR proceeding to explain that in the low purge environment, with all the evidence in front of the person of skill and the art, the person would have been motivated to use higher working capacity, i.e. greater BWC, greater gram-total BWC, and not lower. And so they specifically said, yes, that is evidence that could support a finding, but they weighed the evidence and disregarded the testimony from Dr. Rockstraw. So again, the SAE, Klontz SAE information was viewed to be more persuasive to the board, and that's exactly what their opinion says. Now, there was also argument about the board misapplying the legal standard. That's just not the case. They clearly understood what they needed to do in terms of applying all of the art and starting with the parameter of the claims that requires a low purge, and that given that low purge environment, they needed to look at the totality of the evidence, including Klontz SAE, and as a result, their argument or their finding of non-obviousness is supported by substantial evidence in the record. I think I've addressed the points that Mr. Mazzino raised. If there's no other questions, I can cede my time. Thank you, Mr. Buehrer. Mr. Mazzino has three minutes or so. Thank you, Your Honor. So first, on the question of teaching away, whether the parties agree, I refer to page 2 of Ingevity's brief, their summary, which says, The board rejected VASF's sole obviousness ground based on a factual determination that the prior art, in fact, teaches away from the solution claimed. They also framed their statement of the issues in terms of teaching away. In terms of why the parties thought that, one place I'd point to is Appendix 51, where the board talks about whether Hiltzik alone would suggest the claim limitations, and it says that VASF does not overcome Klontz SAE's strong suggestion that honeycombs with higher capacity than Hiltzik's would be desirable for achieving the emissions at low perch. I think we both understood that as a teaching away finding, which is contrary to this court's precedent about when a reference teaches away. Now, if we are talking about motivation to combine, then I'd refer the court to the decision in DuPont v. Sinvina, where this court reversed the board, saying the board did not consider the normal desire of scientists or artisans to improve upon what is already generally known, which provides the motivation to determine where in a disclosed set of ranges is the optimum combination. Of course, that's a principle this court has applied going back to Henry Peterson, which was actually very similar, selecting the range of 1% to 3% rhenium from the broader range of 0% to 7% rhenium. Here you have the range of 0% to 35% IAC, and the limitations in the 553 effectively just pluck out the range of 0% to 7% IAC. So I don't think there's any real question about whether there should be a motivation here. To switch back to indefiniteness, obviously we agree that the board didn't properly consider our evidence and make the necessary findings, so the court at a minimum should send it back for the board to look at that evidence. But I hope that if the court does that, that it will go further and also provide guidance about where the board got the law wrong. The board focused on qualitative statements in those prior articles that Ingevity submitted that suggested for some purposes artisans didn't consider this significant, but that's highly context-dependent. So just to take one example, the Anson article that Ingevity cited, Anson starts out at the beginning of the article, he says it is, quote, difficult to find good correlation between these two methods. And he says this has led to controversy in the art and uncertainty about the true adsorption capacity about various materials. He goes on to say what he was working on, he was studying hydrogen adsorption by carbon nanotubes, different from what's at issue here. And he says in that context, the absolute values of hydrogen adsorption are so small that the difference between these two measurement methods fell within the range of permissible experimental error. That's completely dependent on context. It does not speak to the correct legal question under this court's precedent, which is would the choice of measurement method potentially affect whether or not a product infringes the claims. On that, I think there is no evidence that it would not affect infringement. All of the evidence suggests that even a disparity in the range the board suggested would affect the infringement analysis. With that, thank you very much. We'd ask that the board's decision be reversed. Thank you, counsel. Appreciate both arguments. Please be seated.